**Gary LABADY, Plaintiff,**

v.

**GEMINI AIR CARGO, INC., Defendant.**

**No. 0320569–CIV.**

United States District Court, S.D. Florida.

Nov. 22, 2004.

Nathaniel Joe Birdsong, Aird & Urrechaga, Pembroke Pines, FL, Ana Maria Urrechaga, Ana M. Urrechaga, Miami, FL, for plaintiff.

Michael William Casey, III, Richard David Tuschman, Erik A. Nelson, Epstein Becker & Green, Miami, for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

BROWN, United States Magistrate Judge.

**This matter** is before this Court on the Defendant's Motion for Summary Judgment, filed on August 13, 2004. The Court has considered the motion, the response, the reply, and all pertinent materials in the file.

Plaintiff's Amended Complaint raises four claims: Title VII/Race Discrimination (Count I), Title VII/Retaliation (Count II), Federal Civil Rights Act/Race Discrimination (Count III) and Federal Civil Rights Act/Retaliation (Count IV). Defendant moves for summary judgment on all counts.

### FACTS

The following statement of facts sets forth those facts which are undisputed and allegedly disputed by the Plaintiff in accordance with Local Rule 7.5(D); *Jones v. Gerwens,* 874 F.2d 1534, 1537 n.3 (11th Cir.1989)("Facts set forth in Defendant's Statement of Undisputed Facts which are not controverted are deemed admitted"). It appears Plaintiff only disputes a small

number of the undisputed facts set forth by the defendant.

### A. The Parties

Defendant, Gemini, is a worldwide Aircraft, Crew, Maintenance and Insurance (ACMI) operator of cargo aircraft. (Def.'s Stat. of Undisp. Facts ¶ 1). Defendant's customers include overnight mail services, freight forwarders, and commercial airlines. *Id.* Plaintiff, Gary Labady, was formerly employed by Defendant as a Loadmaster. *Id.* at ¶ 2. A loadmaster is responsible for overseeing the loading and offloading of aircraft, performing preflight and post-flight checks of aircraft and aircraft systems, computing the weight and balance of cargo, and performing other duties relating to the handling and restraint of cargo. *Id.*

### B. Plaintiff's Hiring and Early Employment at Gemini

In February of 2000, Plaintiff applied to Defendant for the positions of Loadmaster and Flight Engineer. *Id.* at ¶ 4. Plaintiff got an interview for the Loadmaster position. *Id.* at ¶ 4. Brad Smuts ("Smuts"), who was Defendant's Chief Loadmaster, knew that Plaintiff was black and Haitian, like his brother Franz Malvoisin, who had worked for the Defendant since approximately 1996. *Id.* at ¶ 3,5. Plaintiff subsequently interviewed with Alfredo Alonso ("Alonso"), who ran the Loadmaster department with Smuts at the time. *Id.* at ¶ 6. Alonso and Smuts hired Plaintiff as a Loadmaster. *Id.* at ¶ 6. Shortly after plaintiff was hired as a Loadmaster, Alonso became the Miami Base Supervisor, and Smuts became the Manager of Loadmasters. *Id.* at ¶ 7. Plaintiff contends that beginning sometime after March of 2000, he assumed additional job responsibilities and began working, unofficially, as "Assistant Base Supervisor" under Alonso. *Id.*

at ¶ 8. Plaintiff found these additional job responsibilities challenging and he viewed them as stepping stones to a better position with Defendant. *Id.* at ¶ 8.

### C. Plaintiff's Application for a Check Loadmaster Position

In April of 2001, Plaintiff applied for the position of Check Loadmaster. *Id.* at ¶ 9. This was a supervisory position over other loadmasters. *Id.* at ¶ 9. Twelve candidates applied for the position of Check Loadmaster. *Id.* at ¶ 10. Seven candidates, including Plaintiff, were selected for interviews. *Id.* Doug Gregor, Jay Keihner, Curtis Jones, and Brian Keihner were among the seven candidates selected for an interview. *Id.* Of the five candidates who were denied an interview, three were white. *Id.*

There were originally four Check Loadmaster job openings. *Id.* at ¶ 11. However, due to business uncertainty, the number of Check Loadmaster openings was reduced to three with the fourth awaiting approval. *Id.* Doug Gregor, Jay Keihner, and Curtis Jones were selected for the three immediate openings. *Id.* Brian Keihner was selected to fill a Check Loadmaster position if the fourth position was approved or if a Check Loadmaster resigned. *Id.* Brian Keihner went through the Check Loadmaster training with the candidates who were selected to fill the three immediate openings. *Id.* Subsequently, Curtis Jones resigned his position as Check Loadmaster and Brian Keihner was given the position. *Id.*

Plaintiff does not contend that he should have been selected over Doug Gregor. *Id.* at ¶ 12. Plaintiff acknowledges that Gregor, who was selected for the position at JFK Airport in New York, was the most logical choice for that position, since he lived there and had the proper experience. *Id.* In fact, Plaintiff was not interested in a position at JFK. *Id.* Nor does Plaintiff

contend that he should have been selected over Curtis Jones, who was hired for the Check Loadmaster position in Los Angeles. *Id.* at ¶ 13. Plaintiff admits that he was not interested in the Los Angeles position. *Id.* Plaintiff contends that he should have been selected for the Miami Check Loadmaster position instead of Jay Keihner *Id.* at ¶ 14. Plaintiff also contends that he should have been selected for the Check Loadmaster position over Brian Keihner. *Id.*

Plaintiff contends that he was better qualified than Jay Keihner "in certain areas." *Id.* at ¶ 15. First, Plaintiff claims that he was better suited for the job because he lived in Miami, whereas Jay Keihner lived in Costa Rica. *Id.* Second, Plaintiff contends that he had been "doing the job already for approximately one year" by working as Alonso's unofficial "Assistant Base Supervisor." Third, Plaintiff contends that he was more qualified by virtue of his training as a flight engineer and a dispatcher. *Id.* Nevertheless, Jay Keihner had about two-and-a-half years of prior experience as a Check Loadmaster with another company. *Id.* Jay Keihner also had a longer tenure with Defendant than Plaintiff, more years of aviation experience than Plaintiff, and a Master's Degree in System's Management. *Id.*

In addition to credentials, the job interview was a key factor in the selection process for the Check Loadmaster position. *Id.* at ¶ 16. Plaintiff disputes Defendant's claim that he did not impress the selection panel, which included Smuts. *Id;* (Pl.'s Resp. to Undisp. Facts. ¶ 4). When Plaintiff was asked why he applied for the position of Check Loadmaster he replied that "his supervisor told him to apply." (Pl.'s Resp. to Undisp. Facts. ¶ 4). While the statement was correct, Plaintiff contends Defendant mischaracterized his re-

sponse because of its selective citation to Plaintiff' deposition transcript. Plaintiff notes in his deposition transcript that the interviewing panel laughed at the remark. *Id.* at ¶ 5.

Another dispute of fact concerning the interview pertains to Defendant's assertion that Plaintiff never communicated to the panel why he thought he was a viable candidate for the position. (Def.'s Stat. of Undisp. Facts ¶ 16). Plaintiff claims that he did in fact communicate why he was a viable candidate by reemphasizing for the panel his background experience, which the panel members had observed. (Pl.'s Resp. to Undisp. Facts. ¶ 7).

Plaintiff does not dispute Defendant's contention that he did not demonstrate the customer skills required for the position. (Def.'s Stat. of Undisp. Facts ¶ 16). When presented with several customer-related scenarios, his answers were confrontational. *Id.* Jay Keihner's performance in all these areas of the interview was substantially better. *Id.*

Plaintiff also contends that he was better qualified than Brian Keihner. *Id.* at ¶ 17. However, in addition to his prior experience as a Loadmaster, Brian Keihner also had experience as a Check Loadmaster. *Id.* Brian Keihner also interviewed well. *Id.* Brian Keihner's overall professional approach to the interview, his emphasis on the importance of the Check Loadmaster position, and the manner in which he answered questions, left the interviewing panel, including Smuts, with a very favorable impression. *Id.*

### D. Plaintiff's Application for the General Manager Position

In or around June 2001, Plaintiff applied for the position of General Manager in Miami. *Id.* at ¶ 18. Plaintiff was interviewed by telephone along with several other candidates. *Id.* However, due to

budget constraints and a reduction in force, Defendant decided not to fill the position. *Id.*

### E. Plaintiff's Complaints of Unfair Treatment and Discrimination

Plaintiff received Defendant's employee handbook when he started his employment with the company. *Id.* at ¶ 21. The employee handbook contained an "Equal Employment Opportunity" policy outlining the policies, procedures and programs to ensure equal opportunity among all qualified individuals. *Id.*

After Brian Keihner was promoted to Check Loadmaster and prior to the filing of this case, Plaintiff complained to Director of Human Resources Doris Coleman that Brian Keihner's selection was unfair. *Id.* at ¶ 22; (Pl. Dep. at 115). A dispute of fact arises concerning whether or not Plaintiff complained he was being discriminated against because he is black or Haitian. Defendant asserts that Plaintiff did not complain as to such facts, whereas Plaintiff maintains that he did in fact complain about discriminatory conduct in the selection process. (Def.'s Stat. of Undisp. Facts ¶ 22); (Pl.'s Resp. to Undisp. Facts. ¶ 8).

In response to Plaintiff's January 29, 2002 EEOC charge of discrimination, Plaintiff received a Notice of Dismissal and Right to Sue Letter (the "Notice") from the EEOC dated March 14, 2002. (Def.'s Stat. of Undisp. Facts ¶ 26). The Notice advised Plaintiff that he had 90 days from his receipt of the Notice to file suit under Title VII. *Id.* Plaintiff let the 90 days expire without filing suit. He had no intention of filing suit against Defendant at that time. *Id.*

### F. Plaintiff's Performance Problems

During the latter half of 2001 and through July 2002, Plaintiff had numerous performance problems that lessened his value to Defendant and ultimately made him a logical selection for a reduction in force that was carried out in July 2002. *Id.* at ¶ 27. For example, on July 17, 2001, Jorge Gonzalez of Martin Aviation, Defendant's customer, complained that Plaintiff, by eating dinner on the plane and otherwise failing to do his job properly, caused a costly, nearly two hour delay in the departure of the aircraft. *Id.* Plaintiff disputes the accuracy of the customer's complaint, but admits that he complaint was made. *Id.*

On February 4, 2002, Smuts issued Plaintiff a memorandum that documented certain mistakes in weight and balance records that Plaintiff made on December 14, 2001. *Id.* at ¶ 28. Plaintiff admits that he does not know whether anything in Smuts' memo was incorrect. *Id.* The issuance of the memorandum did not result in any adverse employment action. *Id.*

In May 2002, Plaintiff told a customer, "Sal" of Arrow Air, that he did not have time to use a tape measure and locate the pallets that would fit in certain positions on the aircraft; Plaintiff told Sal that this was the customer's responsibility. *Id.* at ¶ 29. Smuts subsequently informed Plaintiff in an email that it was his job to use a tape measure and locate the pallets that will fit, especially for a new customer such as Arrow Air, stating, "That is exactly what your responsibility is as a Loadmaster!" *Id.*

In June 2002, one of Defendant's largest customers, Tampa Air, blamed Plaintiff for causing a significant delay in Medellin, Colombia. *Id.* at ¶ 30.

Tampa Air was affiliated and worked with Martin Aviation. *Id.* at ¶ 31. Thus, Plaintiff admits that the earlier complaint about Plaintiff's causing a nearly two hour delay, and the new complaint about Plain-

tiff's causing a delay in Medellin, were effectively from the same company. *Id.* Ultimately, Tampa Air demanded that Plaintiff not be scheduled on any of its flights. *Id.*

In addition to Defendant's inability to schedule Plaintiff on Tampa Air flights, plaintiff's personal scheduling issues prevented him from taking other trips for Defendant. *Id.* For example, on July 2, 2002, Plaintiff received notice from Felicia Anderson, Defendant's head of crew scheduling, of a trip to Hong Kong that was to begin on July 7, 2002. *Id.* Although Plaintiff claims that this was "short notice," Anderson's memorandum regarding this incident indicates that she emailed Plaintiff with the schedule on June 30th—eight days before the trip was to begin. *Id.* Anderson's memorandum also states that she selected Plaintiff for the trip because: (1) another Loadmaster, Robert Kowaleski, was not available; and (2) Plaintiff was available because he was not able to work on Tampa Air flights because of difficulties he had with that customer. *Id.* Plaintiff contends he had some "personal issues" that prevented him from going on the trip. *Id.* Plaintiff did not tell Anderson what his "personal issues" were, and he also declined to identify them at his deposition. *Id.*

### G. Plaintiff's Lay–Off

After the terrorist attacks on September 11, 2001, Defendant's revenues fell approximately twenty percent. *Id.* at 33. As a result, in January 2002, Defendant grounded about twenty percent of its fleet and laid off approximately twenty-five percent of its workforce. *Id.* Plaintiff was not affected by that layoff. *Id.*

In July 2002, due to a continued downturn in business, Defendant implemented another reduction in force. *Id.* at ¶ 34. This time, Plaintiff and three white Load-masters—David Kiczales, Mike Shea, and Steven Banks—were selected for layoff. *Id.* In accordance with Defendant's policy, these Loadmasters were selected for layoff based on their performance and perceived lack of value to the company. *Id.* Plaintiff's performance was below par. *Id.* In addition, his inability to work on Tampa Air flights because of the customer's request, and other flights because of unspecified "personal" issues, made him significantly less valuable to the company and made it increasingly difficult to find him assignments. *Id.*

### H. Plaintiff's Recall and Termination

In August 2002, due to the resignations of certain Loadmasters, Plaintiff was recalled by Defendant for employment. *Id.* at ¶ 35. Plaintiff disputes this fact and claims he was only recalled because his counsel sent Defendant a letter concerning Plaintiff's termination of employment. (Pl.'s Resp. to Undisp. Facts. ¶ 9).

Plaintiff initially considered returning to Defendant's place of employment. *Id.* at ¶ 36. But, before making a final decision to return to Defendant, Plaintiff received a job offer with Arrow Air to be a Flight Engineer. *Id.* at 37. Plaintiff had always wanted to be a Flight Engineer and believed it would make him more marketable in the aviation industry. *Id.* Thus, he thought he had better long-term prospects with Arrow Air. Plaintiff therefore declined Defendant's recall offer and received a severance package from the company worth over $8,000. *Id.*

### I. Plaintiff's Allegations of Retaliation

On October 11, 2002, Plaintiff filed a charge of retaliation with the EEOC, alleging that Defendant retaliated against him for filing his January 29, 2002 charge of

race and national origin discrimination. *Id.* at 38. Plaintiff alleged in particular that he was subjected to disparate terms and conditions of employment and subsequently terminated from his position of Loadmaster on July 23, 2002. *Id.*

In his Amended Complaint, Plaintiff alleges that Defendant's retaliation consisted of the following: requiring Plaintiff to work remote locations on short notice; reducing Plaintiff's scheduled flights; giving Plaintiff unwarranted reprimands; denying Plaintiff access to the appropriate grievance procedures afforded to other non-Black, Haitian Defendant employees; and ultimately terminating his position. *Id.* at 39.

## DISCUSSION

### I. Standard on Motion for Summary Judgment

The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). Summary judgment is proper only when no genuine issue as to any material fact exists and the moving party is entitled to a judgment as a matter of law. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.2002).

The moving party bears the initial burden of explaining to the Court the basis for the motion and identifying those portions of the record that demonstrate that there is no genuine issue of material fact. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991). Thus the movant must either show that the nonmoving party has no evidence to support its case, or present "affirmative evidence

demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438; *Young v. City of Augusta,* 59 F.3d 1160, 1170 (11th Cir.1995). But the Court must view all of the evidence in the light most favorable to the nonmoving party, with all reasonable inferences also being drawn in the nonmovant's favor. *Info. Sys. & Networks,* 281 F.3d at 1224; *Four Parcels of Real Prop.,* 941 F.2d at 1437. If the movant is able to demonstrate either of the aforementioned requirements, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Four Parcels of Real Prop.,* 941 F.2d at 1438.

A genuine issue as to material fact exists only when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Four Parcels of Real Prop.,* 941 F.2d at 1437; *Info. Sys. & Networks,* 281 F.3d at 1224. The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. An issue of fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989). However, if the facts and inferences overwhelmingly favor one side, such that a reasonable jury could only arrive at one verdict, then summary judgment must be granted as a matter of law. *Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1167 (11th Cir.1997). And for the nonmovant to survive such a grant, there must be more than a mere scintilla of evidence. *Id.*

## II. Count I—Time–Bar

In Count one, Plaintiff alleges Defendant racially discriminated against him in violation of Title VII when he was denied the position of General Manager and Check Loadmaster. Due to this alleged discrimination, Plaintiff filed a charge of discrimination with the EEOC on January 29, 2002. (Pl.Dep., Exh. 8). In response, the EEOC issued a right-to-sue letter on March 14, 2002 setting forth the requirement that Plaintiff must file a lawsuit against the Defendant "within 90 days from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost." *See* 42 U.S.C. § 2000e–5(f)(1); (Pl.Dep., Exh. 12). Plaintiff admits that he was aware of the 90 day time period, but allowed it to expire since he had no intention of bringing a discrimination suit against Defendant. (Def.'s Stat. of Undisp. Facts ¶ 26). Because Plaintiff filed suit on March 12, 2003, approximately a year after the mailing date of the right-to-sue letter concerning his discrimination charge and asserts no reasons for extended delays or equitable tolling, this court finds that count I of Plaintiff's claim is untimely.

█ Additionally, Plaintiff may not circumvent the timeliness requirements of Title VII by alleging the time-barred acts of discrimination are at issue in his timely filed retaliation claim. The law is clearly established that discrete, time-barred discriminatory actions are not actionable, regardless of how they may relate to actions that were filed in a timely fashion. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Discrete acts are recognized as actions "such as termination, failure to promote, denial of transfer, or refusal to hire ...." *Id.* at 114, 122 S.Ct. 2061. The alleged denial of promotion based on race discrimination by Defendant constitutes a separate actionable event for which a timely cause of action should have been brought. The subsequent timely filing of a retaliation claim does not allow Plaintiff to thwart the 90 day filing requirement and argue the merits of his discrimination claim. *See Guevara v. Best Western Stevens Inn, Inc.*, No. 03–2056, 2003 WL 22407428 (10th Cir. October 22, 2003); *see also Soso Liang Lo v. Pan American World Airways*, 787 F.2d 827, 828 (2nd Cir.1986) ("whether the present action is time barred must be determined with reference to only the first Notice of Right to Sue. Otherwise the time limitations of 42 U.S.C. § 2000e–5(f)(1) would be meaningless, because potential Title VII plaintiffs could evade those requirements simply by seeking additional Notices of Right to Sue whenever they pleased."). Plaintiff's first EEOC charge encompasses everything in his second charge with the exception of his claim of retaliatory discharge. Accordingly, plaintiff's claim of racial discrimination is time-barred.

Finally, Plaintiff may not rely on the continuing violation doctrine by restating in his second charge of discrimination, filed with the EEOC on October 11, 2002, that the discriminatory conduct he allegedly experienced at the time of his denial of promotion continued through his termination in July 2002. In *Lewis v. Norfolk Southern Corp.*, 271 F.Supp.2d 807, 812 (E.D.Va. 2003) the plaintiff attempted to revive two time-barred denial of promotions claims vis-a-vis a subsequently timely filed retaliation claim on the basis of the continuing violation doctrine. In rejecting the plaintiff's argument, the *Lewis* court noted "that there is a substantial body of case law explicitly declaring that [the continuing violation doctrine] does not apply to extend the time to file an EEOC charge." *Id.; see, e.g., Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 (6th Cir.2001).

Furthermore, the court in *Sabree v. United Broth. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 402 (1st Cir. 1990) found that "[a] knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." Moreover, although Plaintiff alleges "that the discriminatory conduct he experienced at Defendant's place of employment continued from the time of his first filing of discrimination with the EEOC up and through Plaintiff's termination in July 2002," Plaintiff did not check-off the continuing action box and the alleged dates of discrimination, 07/05/2002—07/23/2002, are more than a year after the dates stated in Plaintiff's first charge of discrimination with the EEOC. (Pl.'s Resp. to Sum. Judg. at 4)(Pl.Compl., Exh. A).

Due to the inapplicability of the continuing violation doctrine to Plaintiff's case and inconsistencies between Plaintiff's charge of discrimination and Plaintiff's Response to Defendant's Motion for Summary Judgment, this Court finds that Plaintiff may not state a claim under the continuing violation doctrine. Consequently, this court finds that Count I of Plaintiff's Amended Complaint is time-barred, and Defendant's request for summary judgment on Count I of Plaintiff's Amended Complaint with regard to Plaintiff's first EEOC charge is granted.

### III. *Plaintiff Cannot Establish a Prima Facie Case of Discriminatory Failure to Promote*

Defendant admits that Plaintiff's claim of discrimination against Defendant pursuant to the Florida Civil Rights Act, Chapter 760.10 *et al.* ("FRCA") in Count III is timely. Therefore, it is necessary to address Plaintiff's denial of promotion for the General Manager and Check Loadmaster positions. The Florida Civil Rights Act, as amended, was patterned after Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000, et seq. *Florida State University v. Sondel*, 685 So.2d 923, 925 at n. 1 (Fla. 1st DCA 1996). Federal case law interpreting Title VII is therefore applicable to cases arising under the FCRA. *Id.* (citing *Florida Department of Community Affairs v. Bryant*, 586 So.2d 1205 (Fla. 1st DCA 1991)).

Plaintiff has produced no direct evidence of discriminatory intent, and therefore Plaintiff must prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims, which requires that in order to establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir.2001). Once these elements are established, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Id.*

### A. Prima Facie Case—General Manager Position

■ Due to Defendant's decision not to fill the General Manager position, Plaintiff is unable to set forth a prima facie case of racial discrimination. The undisputed facts reveal that while Defendant inter-

viewed Plaintiff and several other candidates for the General Manager position, it decided not to fill the position due to budget constraints and a reduction in force. (Def.'s Stat. of Undisp. Facts ¶ 8). Thus, because Plaintiff cannot satisfy the fourth prong of the prima facie test that "other equally or less qualified employees who were not members of the protected class were promoted," he is unable to make out a prima facie case of discriminatory failure to promote.

## B. Prima Facie Case—Check Loadmaster Position

As mentioned in the facts cited above Plaintiff was not promoted to any of the three Check Loadmaster positions. In attempting to establish a Prima Facie case of discrimination with respect to the Miami Check Loadmaster position, Plaintiff claims he was better qualified than Jay Keihner and that he should have been selected for the opening caused by Curtis Jones' resignation, instead of Brian Keihner. *Id.* at ¶ 14.

### 1. *Jay Keihner was Better Qualified than Plaintiff*

 Plaintiff claims he was better qualified than Jay Keihner "in certain areas." *Id.* at 15. Specifically, Plaintiff contends that: (1) because he lived in Miami he was more qualified than Jay Keihner who lived in Costa Rica; (2) he was able to handle the workload for approximately one year as Alonso's unofficial "Assistant Base Supervisor," and Jay Keihner was not capable of performing the work; and (4) while he possessed the desired skills of a flight engineer and a dispatcher, Jay Keihner did not. *Id.* However, Plaintiff does not dispute the fact that Jay Keihner had about two-and-a-half years of prior experience as a Check Loadmaster with another company, had a longer tenure with Defendant than Plaintiff, more years of aviation experience than Plaintiff, and a Master's Degree in Systems Management. *Id.* Plaintiff argues that since Jay Keihner had worked as a Check Loadmaster while employed at another company, a reasonable fact-finder could infer that Jay Keihner was not better qualified. This is merely a conclusory argument and Plaintiff has not adduced evidence sufficient to suggest a Check Loadmaster position at one place of employment is so different as to affect qualification at Defendant's place of employment.

In addition to credentials, Defendant also considered the interview an integral part of the selection process. (Def.'s Stat. of Undisp. Facts ¶ 16). During the interview, Plaintiff made the statement that he applied for the Check Loadmaster position because his Supervisor told him to. *Id.* Defendant maintains that the interviewing panel considered this statement inappropriate. (Coleman Dec. ¶ 6; Smuts Dec. ¶ 8). Plaintiff does not dispute the fact that the statement was made, but disputes how Defendant characterized it. (Pl.'s Resp. to Sum. Judg. at 2). Plaintiff testified in his deposition that the above response was made in a joking manner and met with laughter from the interviewing panel. (Pl.'s Resp. to Undisp. Facts. ¶ 5). Although the interviewing panel may have laughed at the remark, this by itself does not suggest that the interviewing panel considered the remark either appropriate or inappropriate. Furthermore, Plaintiff may not testify whether the interviewing panel did in fact consider the remark appropriate because he has no personal knowledge of how they perceived his comment. *See* Fed.R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Accordingly, his testimony is nothing more than self-serving specula-

tion which cannot be considered on summary judgment. Fed.R.Civ.P. 56(e); *Watson v. Adecco Employment Services*, 252 F.Supp.2d 1347, 1352 (M.D.Fla.2003)(holding that inadmissible deposition testimony could not be considered in opposition to a motion for summary judgment; "[D]eposition testimony, just like affidavits, in support or opposition to a summary judgment motions, must set forth facts as would be admissible in evidence.")

Even drawing the inference in the light most favorable to Plaintiff that the panel did find the remark funny and even appropriate, this issue does not rise to the level of a materially disputed fact, such as to defeat summary judgment. A dispute over the assessment of a joke is significantly dwarfed by issues of qualifications and experience in a hiring decision.

Moreover, Plaintiff disputes Defendant's contention that Plaintiff never communicated to the panel why he was a viable candidate, claiming that he stated that "they knew my background already, they've seen my performance in the past, I did everything already, something to that effect." *Id.* However, just because Plaintiff responded to the question does not mean that his answer was sufficient. Accepting that Defendant did not think such a response was responsive, a subjective reason can be a legitimate, non-discriminatory reason for adverse employment action. *See Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir.2000)( finding that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion"). Plaintiff's inability to convince Defendant that he was a viable candidate certainly satisfies this requirement.

Finally, Plaintiff does not dispute Defendant's conclusion regarding his customer skills. (Def.'s Stat. of Undisp. Facts ¶ 6).

The interviewing panel found that Plaintiff's answers to customer-related scenarios were confrontational. *Id.*

In conclusion, the panel found that not only were Jay Keihner's qualifications superior to Plaintiff's, but his performance in all areas of the interview was substantially better. *Id.* As discussed above, a subjective opinion is a legitimate reason for not promoting an employee. Furthermore, Plaintiff's alleged disputes concerning the interview do not rise to the level of materiality required to defeat a summary judgment claim.

### 2. *Brian Keihner was Better Qualified than Plaintiff*

Brian Keihner not only had experience as a loadmaster, but also as a Check Loadmaster. (Def.'s Stat. of Undisp. Facts ¶ 17). Additionally, according to Smuts and the interviewing panel, Brian Keihner interviewed well. He displayed an overall professional approach to the interview, was cognizant of the importance of the Check Loadmaster position, and the manner in which he answered the questions asked during the interview left a favorable impression upon the panel. *Id.* In contrast, as discussed above, Plaintiff did not adequately communicate why he was a viable candidate for the promotion and display the appropriate professional demeanor required of a Check Loadmaster. Plaintiff does not dispute any of these facts concerning Brian Kheiner nor does he make an argument as to why this claim should survive summary judgment. Accordingly, Plaintiff cannot establish a genuine issue of material fact concerning whether Brian Keihner was better qualified than Plaintiff.

### C. Defendant has Established a Legitimate, Non–Discriminatory Reason for the Challenged Employment Action

■ Even if this court were to consider Plaintiff's allegations and facts sufficient to

establish a prima facie case of discrimination, Defendant has satisfied its burden of producing legitimate, non-discriminatory reasons for not offering the Check Loadmaster position to Plaintiff. Thus, Plaintiff now has the burden of proving those reasons to be a pretext for unlawful discrimination.

### D. Plaintiff has Failed to Prove Defendant's Reasons to be a Pretext for Unlawful Discrimination

Even assuming that Plaintiff's facts concerning his qualifications sufficed for establishing a prima facie case, they alone are not enough to suggest Defendant was racially motivated. "In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000). Additionally,

> [a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman*, 229 F.3d at 1030. *See also Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) (finding that "it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").

In order to prove that Defendant's reasons for not promoting Plaintiff to the position of Check Loadmaster were pre-textual, Plaintiff "must adduce evidence that the disparity in qualifications between him and Jay and Brian Keihner is so apparent as virtually to jump off the page and slap you in the face." *Cofield v. Goldkist Inc.*, 267 F.3d 1264, 1268 (11th Cir.2001). The relevant inquiry for this Court is not to determine who was better qualified, but to determine whether any disparity between Plaintiff's and the other applicant's qualifications is so great that a reasonable fact-finder could infer that Defendant did not believe Jay and Brian Keihner was better qualified. *Id.* Given the above discussion of Jay and Brian Keihner's credentials and solid performances in the interview, Plaintiff simply cannot satisfy this burden.

Moreover, Plaintiff cannot point to any evidence that would seem to suggest Defendant's Manager of Loadmasters, Smuts, hired according to race or ethnicity. Plaintiff admits that he never heard any racial remarks prior to applying for the Check Loadmaster position. (Def.'s Stat. of Undisp. Facts ¶ 23). Also, evidence that Smuts was involved in Plaintiff's hiring further suggests that Smuts did not act with discriminatory motive toward Plaintiff. A fair inference can be made that if Smuts was truly prejudiced against blacks or Haitians, he would not have hired Plaintiff in the first instance. *See Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1443 (11th Cir.1998) (holding evidence that the same person responsible for hiring plaintiff after he already was in the protected age group was also responsible for promoting him, for attempting to prolong his stay with employer, and, ultimately, for terminating him, may give rise to a permissible inference that no discriminatory animus motivated the employer's actions). *See also Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270–71 (9th Cir.1996) ("Where the same actor is responsible for

both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."); *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 959 (4th Cir.1996)("[B]ecause Houseman is the same person who hired Evans, there is a powerful inference that the failure to promote her was not motivated by discriminatory animus.")(internal quotation and citation omitted).

Furthermore the record fails to reveal any instances of a discriminatory motive on the part of Defendant, specifically Smuts. Evidence that Jay Keihner worked as a Check Loadmaster for another company certainly does not "jump off the page" and "slap one in the face" with the stench of a discriminatory practice. *Cofield,* 267 F.3d at 1268. Even if this court acknowledges Plaintiff's argument that a reasonable fact-finder could infer that Plaintiff was better qualified than Jay Keihner, this is not the standard when attempting to establish pretext for discriminatory behavior. Maintaining an argument that either candidate was qualified and Defendant simply based its decision on race, as Plaintiff has attempted to demonstrate, voids any possibility of a great disparity of qualifications between Plaintiff and Jay and Brian Keihner. Accordingly, Defendant is entitled to summary judgment on Count III of Plaintiff's claim that he was denied the General Manager position and Check Loadmaster position because of his race.

### III. *Plaintiff Failed to Set Forth a Prima Facie Retaliation Claim*

In order to establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Stavropoulos v. Firestone,* 361 F.3d 610, 616 (11th Cir.2004). If Plaintiff is able to establish his prima facie case, the burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions. *Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1572 (11th Cir.1993). This burden of rebuttal is "exceedingly light." *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989). Since the rebuttal burden is one of production only, the employer "need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the employer's evidence raises a genuine issue of fact as to whether it discriminated against the employee." *Id.* The plaintiff can refute these reasons by proving that they are pre-textual. *Id.* Again, the burden of production shifts, but the burden of persuasion remains with the plaintiff. *Id.*

#### A. Protected Activity

By filing an EEOC charge of discrimination and retaliation, it is apparent that Plaintiff participated in an investigation under Title VII and therefore engaged in protected activity. *See, e.g., Buzzi v. Gomez,* 62 F.Supp.2d 1344, 1353 (S.D.Fla. 1999).

#### B. Adverse Employment Action and Causal Link

■ "To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must meet some threshold level of substantiality." *Stavropoulos,* 361 F.3d at 616–617. Ultimate employment decisions include decisions such as termination, failure to hire, or demotion. In *Gupta v. Fla.*

*Bd. of Regents,* 212 F.3d 571, 588 (11th Cir.2000) the Court characterized the threshold as requiring the employment action to be " 'objectively serious and tangible enough' to alter [the employee's] 'compensation, terms, conditions, or privileges of employment ...,' " and further held that "[a]n action which, it turns out, had no effect on an employee is not an 'adverse' action." *Id.*

Once Plaintiff establishes the existence of an adverse employment action, he must prove there was a causal link between the adverse employment action and the protected activity. In order to establish the causal link, Plaintiff "need only establish that the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. [citation omitted]. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Id.* Plaintiff attempts to prove the following acts by Defendant are evidence of adverse employment actions.

### (i) "Requiring Plaintiff To Work Remote Locations on Short Notice."

■ Plaintiff alleges Defendant required him to work in remote locations on short notice, contrary to previous work practices. (Amen. Compl. at 6). The facts concerning Plaintiff's claim that he was scheduled to fly to Hong Kong on short notice are undisputed, and are that Anderson, Defendant's head of crew scheduling, emailed Plaintiff on June 30, 2002 concerning a trip to Hong Kong that was to begin on July 7, 2002. (Def.'s Stat. of Undisp. Facts ¶ 32). Plaintiff, however, claims he did not receive notice until July

2, 2002. *Id.* Whether Plaintiff received notice 8 days or 5 days prior to the scheduled departure is immaterial to establish an adverse employment action without some additional evidence that such notice is insufficient in the air cargo industry or to the "usual" amount of notice he is given notice for a similar trip. Mere conclusory statements are not enough to prove an adverse employment action. *See Maclin v. Northern Telecom. Inc.,* 1998 WL 386360 (N.D.Ill., 1998) (noting that the plaintiff did not explain how a single incident in which her supervisor changed her travel schedule constituted an adverse employment action).

Furthermore, Plaintiff does not refute additional support provided by the Defendant concerning Plaintiff's selection for the trip. Anderson's memorandum states that she selected Plaintiff for the trip because: "(1) another Loadmaster, Robert Kowelewski, was not available; and (2) Plaintiff was available because he was not able to work on Tampa Air flights because of difficulties he had with that customer." (Def.'s Stat. of Undisp. Facts ¶¶ 27–31). Because Plaintiff has produced no evidence as to why this single trip to Hong Kong constitutes "short notice" and no facts to dispute Defendant's rationale for scheduling him on this trip, Plaintiff has failed to establish that such scheduling constitutes an adverse employment action.

### ii. "Reducing Plaintiff's scheduled flights"

■ Plaintiff alleges Defendant retaliated against him by reducing Plaintiff's scheduled flights, thereby greatly affecting Plaintiff's earning potential. While a reduction in scheduled flights is evidence of a tangible reduction in compensation and thus an adverse employment action, Plaintiff has failed to establish the requisite causal connection between the EEOC charge of discrimination and the reduction

in flights. Plaintiff's claim that the "actions of retaliation" came after he complained of discrimination is insufficient both to prove a causal connection and to contradict Defendant's two reasons for the reduction in scheduled flights. Defendant states that one of Defendant's largest customers, Tampa Air, demanded that Plaintiff not be scheduled on their flights. (Def.'s Stat. of Undisp. Facts ¶ 31). Whether or not this request was warranted, it does not discount Defendant's reliance on it's customer's version of events. *See Simpson v. Montgomery Ward & Co.*, 124 F.3d 205 (7th Cir.1997) (holding that an employer whom relied on four customer complaints without asking for the employees version of the facts is not evidence of pretext). Secondly, Plaintiff's personal issues prevented him from traveling to Hong Kong, thereby accounting for the reduction in his wages. While the standard for establishing a causal connection is minimal, this court is not aware of any other instances of travel reduction than the ones cited to by Defendant. As to those matters, Defendant has demonstrated that Plaintiff is unable to support his case.

### iii. "Giving Plaintiff Unwarranted Reprimands"

■ In a memorandum dated February 4, 2002, Bradley Smuts reminded Plaintiff of the need to provide an accurate and complete presentation of the weight and balance record for purposes of complying with Federal Aviation Administration requirements. (Def.'s Stat. of Undisp. Facts ¶ 29; Smuts Dec. Ex. 2). Mr. Smuts listed the errors and urged Plaintiff to take the necessary steps to guard against a reoccurrence. (Smuts Dec. Ex. 2). Plaintiff does not claim that Mr. Smuts was incorrect in his allegations. Furthermore, in response to a complaint filed by one of Defendant's customers, Mr. Smuts sent an email dated May 20, 2002, informing Plaintiff that it was his job to use a tape measure and locate the pallets that will fit. (Def.'s Stat. of Undisp. Facts ¶ 29; Smuts Dec. Ex. 3). Considering the language in the email, it appears Mr. Smuts was upset with the way Plaintiff handled a new customer and insisted on the need to treat customers in a professional manner. (Smuts Dec. Ex. 3).

There is no evidence that these letters triggered any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities, or more formal discipline. Plaintiff asserts that these communications had the "effect of categorizing Plaintiff as a non-valuable employee susceptible to termination for alleged performance issues." (Pl. Amend. Compl. at 8). However, this unsupported assertion does not have a tangible adverse effect on the Plaintiff's employment conditions. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir.2001) (holding that job performance memoranda that did not trigger a tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline was not actionable). The term "susceptible to termination," is not equivalent to actual termination and it is neither apparent nor alleged that Plaintiff suffered any reduction in wages or more formal discipline sufficient enough to assert an adverse employment action.

### iv. "Denying Plaintiff Access to the Appropriate Grievance Procedures"

While Plaintiff alleges he was denied access to the appropriate grievance procedures, Plaintiff asserts in his statement of disputed facts that he did in fact complain about discriminatory conduct in the selection process to the Director of Human Resources Doris Coleman. (Pl.'s Stmt. of

Disp. Facts. ¶ 8). Plaintiff then states that Human Resources was on notice as to Plaintiff's charge of discrimination. *Id.* This Court finds that only a denial of the appropriate grievance procedures would possibly sustain an adverse employment action and it is evident that such a denial does not exist here. Given Plaintiff's complaint to Human Resources, Plaintiff has not asserted an additional argument as to what other grievance procedure he was denied. Therefore, Plaintiff has failed to show that he suffered an adverse employment action in this respect.

### v. "Ultimately Terminating Plaintiff's Position"

■ In his final allegation of adverse employment action, Plaintiff seeks to establish a causal connection between his termination and his EEOC charge of discrimination. (Def.'s Stat. of Undisp. Facts ¶ 39). Although termination certainly satisfies an adverse employment action, because Plaintiff does not dispute those facts relied on by the Defendant in its ultimate decision to terminate, this Court finds that Plaintiff is unable to meet the causal connection requirement necessary to establish a prima facie case for retaliation.

Defendant has established evidence sufficient to support a finding that Plaintiff was terminated due to performance problems. For example, in a letter dated July 17, 2001, the accuracy of which Plaintiff disputes, Jorge Gonzalez of Martin Aviation, a Gemini customer, complained that Plaintiff spent his time eating dinner, instead of supervising the loading of the aircraft causing additional costs and a nearly two hour delay in the departure. (Def.'s Stat. of Undisp. Facts ¶ 27). As stated above, an employer is entitled to rely on a customer's version of events. *Simpson,* 124 F.3d 205. On February 4, 2002, Smuts issued Plaintiff a memorandum documenting that certain mistakes

were made on a weight and balance record prepared by Plaintiff. (Def.'s Stat. of Undisp. Facts ¶ 28). Plaintiff does not claim that anything in the memorandum is incorrect. In May 2002, Smuts, in response to a customer complaint, had to remind Plaintiff that it was his responsibility as a Loadmaster, not the customer's, to use a tape measure and locate the pallets that will fit in certain positions on the aircraft. In June 2002, Plaintiff was again cited by one of Defendant's largest customers, Tampa Air, for causing a significant delay in Medellin, Colombia. (Def.'s Stat. of Undisp. Facts ¶ 30). These complaints and others eventually led to Tampa Air's request that Plaintiff no longer be scheduled on their flights. (Def.'s Stat. of Undisp. Facts ¶ 31). Whether Tampa Air and Martin Aviation were in fact the same company, as Plaintiff argues, is of little importance. The fact that such a demand was raised by a significant client has a harmful effect on Defendant's reputation and course of dealing. Also, as discussed above, Plaintiff's personal choices prevented him from working on certain trips for the Defendant. It would not make business sense for Defendant to retain employees who, because of customer complaints, are limited in their working capacity. Such an employee is less valuable and more costly to the company.

Additionally, Defendant supports its decision to lay Plaintiff off by citing financial reasons. Due to the terrorist attacks on September 11, 2001 and a continued downturn in business, Defendant was forced to make two reductions in its work force. In January 2002, Plaintiff was not affected by Defendant's decision to ground about 20% of its fleet and lay off approximately 25% of its workforce. (Def.'s Stat. of Undisp. Facts ¶ 33). In a July 2002 reduction in force, occurring. after Plaintiff's January 29, 2002 EEOC charge of discrimination,

Plaintiff and three white loadmasters were selected for layoff. These individuals were selected for layoff in accordance with Defendant's policy, due to their poor performance and perceived lack of value. (Def.'s Stat. of Undisp. Facts ¶ 34). Although Plaintiff was laid off during the second round of reductions in force, subsequent to his charge of discrimination, Defendant has presented evidence which leads this Court to conclude that Plaintiff was chosen to be laid off due to his inability to properly perform his job function, conflicts with customers and personal issues and not because of any ill motive on the part of Defendant.

In August 2002, due to the resignations of certain Loadmasters, Plaintiff was actually recalled for employment. Plaintiff claims he was only recalled because his counsel sent Defendant a letter concerning Plaintiff's termination of employment. The Court fails to recognize the significance of this claim. The significant fact pertinent to the issue of termination is that Defendant was recalled for employment. If Plaintiff was recalled for employment he in effect suffered no adverse employment action. *See Gupta, supra.*

For the foregoing reasons, Plaintiff is unable to set forth a prima facie case of retaliation and Defendant is entitled to summary judgment on Counts II and IV of the Amended Complaint.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment is hereby **GRANTED** in its entirety.